## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Lutheran Senior Services | : | |
| Management Company, | : | |
| Petitioner | : | |
| | : | No. 1074 C.D. 2016 |
| v. | : | |
| | : | Submitted: November 4, 2016 |
| Workers' Compensation Appeal | : | |
| Board (Miller), | : | |
| Respondent | : | |

BEFORE:   HONORABLE RENÉE COHN JUBELIRER, Judge
            HONORABLE PATRICIA A. McCULLOUGH, Judge
            HONORABLE JAMES GARDNER COLINS, Senior Judge

OPINION BY
JUDGE McCULLOUGH                                    FILED:  February 15, 2017

Lutheran Senior Services Management Company (Employer) petitions for review of the June 8, 2016, order of the Workers' Compensation Appeal Board (Board) affirming the decision of the Workers' Compensation Judge (WCJ) granting the claim petition of Jerry Miller (Claimant).

### Facts and Procedural History

Claimant filed a claim petition on April 22, 2014, alleging ongoing disability from a "broken eye socket, broken pelvis, ruptured bladder, [and] multiple scars and disfigurements" arising out of a "work-related motor vehicle accident" on March 13, 2014.  (Reproduced Record, (R.R.) at 3.)  Employer filed a timely answer

on May 6, 2014, denying all material allegations and demanding strict proof of those allegations. (R.R. at 7-9.) At the first hearing before the WCJ on May 19, 2014, Employer orally amended its defenses to include the defense that Claimant was not in the course of his employment when he was injured. (R.R. at 13-14.)

Claimant testified before the WCJ that he had worked for Employer for twelve years as Director of Maintenance, overseeing three other employees. He stated that he was a salaried employee exempt from the overtime requirements of the Fair Labor Standards Act,[1] whose regular work hours were Monday through Friday, starting at 7:00 a.m. and ending at 3:30 p.m. (R.R. at 20-22, 47.)

According to both Claimant and Diana Seip (Employer's Executive Director), Employer maintained a four-building campus over eighteen acres as a facility for senior citizens. (R.R. at 20-21 and 79-81.) According to Ms. Seip, as part of the protection for its residents, Employer had a system of security cameras spread out over the campus. Proper functioning and accuracy of these security cameras was an important priority for Employer. (R.R. at 93-94.)

At the July 14, 2014, hearing, Claimant testified that as Director of Maintenance, "It means I oversee the maintenance staff, help implement all the building's systems, repair the building's systems, [and] respond to after-hours emergencies." (R.R. at 20.) He testified that he was called in to work while off-site two to three times monthly. (R.R. at 22-23.) Whenever he was called in to work while off-site, Claimant testified that in lieu of additional pay, he received "comp time," which accumulated from the time he picked up the phone until when he arrived back home. This "comp time" was to be taken as soon as possible after being

---

[1] 29 U.S.C. §213(a)(1).

2

called in, and for the same time as the non-exempt, wage employees he supervised, that is, door to door, from home to work and back. (R.R. at 23-27.)

Claimant testified about Employer's "on call" policy and admitted into evidence Employer's written "on call" policy. That policy stated in pertinent part:

> Employees on-call for after hours maintenance problems are not compensated for carrying the pager since these employees are able to pursue personal activities and interests while carrying the pager. However, once a call is received and a determination is made that it is necessary to go to Luther House [the four-building site], this time will be considered work time from the point that the employee begins responding to the call until the work is done and the employee arrives home or at whatever activity or location where the pager call was received. All of this time should be recorded on the timesheet for that workweek.

(R.R. at 68.) The written policy also permitted the employee to record a minimum of three work hours if the employee must return to Luther House to respond to an emergency maintenance call, and receive mileage reimbursement. (R.R. at 69.)

Claimant stated that he awoke the morning of March 13, 2004, "feeling very poor, very weak," from being up all night due to a reaction to a prescription medication. (R.R. at 30.) He stayed home past his usual 7:00 a.m. start time and called his ex-wife, Jacqueline Miller, about his physical symptoms inasmuch as she was a trained EMT. (R.R. at 30-32.) While on his cell phone with Ms. Miller, Claimant testified that Ms. Seip "beeped in," and he accepted the call. According to Claimant, she asked him if he was available to handle the security cameras being down, and he said he told Ms. Seip he was home and not available because he was sick, and for such emergencies, "the other guys were supposed to respond if they can handle it." (R.R. at 32, 48.)

3

Claimant characterized the camera malfunction as "an emergency, but not life or death," and when he told Ms. Seip he intended to take a sick day, she advised him that the others had already called off. Claimant noted that he was not infectious, and felt obligated " to go in and fix these cameras." "I didn't want to make her [Ms. Seip] mad." (R.R. at 32-33, 48, 53-54.)

Claimant denied that he told Ms. Seip that he had planned on coming in to work; rather, he insisted that he told her he intended to take a sick day. Additionally, when he agreed to come in, he said he told her he was not staying the whole shift, and she was fine with that. (R.R. at 53-55, 127-28.)

Claimant also adduced the testimony of Ms. Miller, taken by deposition on November 4, 2014. She confirmed that they had been married for twenty years and were divorced in September of 2013. (R.R. at 141.) A licensed EMT, she testified that her ex-husband called her on the morning of March 13, 2014, telling her "he wasn't feeling well from a new medicine he started." (R.R. at 141.) She continued, "He said he was nauseous, he was dizzy…and tired." (R.R. at 141, 143.) Then, she testified, Claimant told her he was calling off sick that day, but "Diane" (Ms. Seip) had beeped in, so that he told Ms. Miller that he was going in to fix the cameras and then come home, intending to take the rest of the day off to be with their baby grandson Liam. (R.R. at 141-42.)

Claimant testified that, after speaking with Ms. Seip he showered and began driving to work. He testified that he began feeling nauseous en route from home to work, which caused him to veer off the road and hit a telephone pole. (R.R. at 35.) He testified that he remains under the care of doctors and physical therapists and has not been able to return to work since the accident. (R.R. at 41.)

4

Claimant also presented the deposition testimony of his treating physician, William C. Murphy, D.O. A board-certified physiatrist, Dr. Murphy has treated Claimant since the accident and continues to treat him. He testified that "as of the date of the accident, he [Claimant] would have been disabled based on the extent of his severe injuries." In fact, Dr. Murphy testified that Claimant "is totally disabled from all employment." (R.R. at 145, 146, 150.)

The Employer's Executive Director, Ms. Seip, confirmed Claimant's testimony about his schedule and job duties. (R.R. at 88.) She described Employer's "on call " system as "if there was something that happened after hours that was necessary to be fixed before the next day, then the on-call system would kick into place and the maintenance men would come in and take care of it." (R.R. at 87-88.) She testified that the written policy applied only to non-exempt, wage employees (not Claimant), but she never addressed the specific "on call" procedure for Claimant and never rebutted Claimant's assessment and summary of that policy as it applied to him. She also described Employer's sick leave policy, which she said was fairly simple: just call or send her an e-mail before the shift starts. (R.R. at 88, 91, 100-01.)

On the morning of March 13, 2014, Ms. Seip testified that the security cameras were down, and she called Claimant on his cell phone, assuming he was already at work. She testified that she got through to Claimant, who informed her he was getting dressed and coming in to work. She testified that Claimant never mentioned anything about taking a sick day, and that because Claimant was one of only two employees who understood the camera system (and the other had already called off sick), she told Claimant, "You need to…get this camera working…" (R.R. at 92-95, 99, 108-10, 118-19.)

Employer also offered the deposition testimony of Menachem Meller, M.D., who is board-certified in orthopedic surgery. Dr. Meller examined Claimant once, at the request of the Employer, on November 17, 2014. (R.R. at 163.) Dr. Meller related all of Claimant's symptoms and restrictions to pre-existing, degenerative, non-work-related conditions. (R.R. at 168.) He concluded that Claimant "does require treatment, but not due to the car accident." (R.R. at 170.)

The WCJ described the "threshold issue" before him as whether Claimant was in the course and scope of his employment at the time of the accident. (WCJ's Finding of Fact No. 1.) After assessing the testimony of Claimant, Ms. Seip, and Claimant's ex-wife (a trained EMT with whom Claimant has been talking on his cell phone about his physical condition on the morning of March 13, 2014), Dr. Murphy, (Claimant's treating physician), and Dr. Meller (Employer's examining physician), the WCJ found: "While Claimant has a fixed place of employment, and his commute to work would ordinarily not be deemed in the course of his employment, special circumstances were present on the day of injury, March 13, 2014, so as to earmark Claimant's commute to work that day as being on a 'special mission' for Employer." (WCJ's Finding of Fact No. 6.) Put another way, the WCJ found that "Claimant was sick on March 13, 2014, and except for the special need of the Employer to assure [that the] surveillance cameras became operative . . . Claimant would not have gone to work." *Id.*

Having determined that the claim petition was not excluded by the "coming and going rule," the WCJ resolved the medical issues in favor of Claimant, finding Dr. Murphy more credible than Dr. Meller, so that he found Claimant to have been totally disabled from the date of injury continuing up through the present. (WCJ's Findings of Fact Nos. 4, 8-11.)

Employer filed an appeal to the Board, arguing that compensation was precluded by the "coming and going rule." In an opinion and order dated June 8, 2016, the Board rejected Employer's appeal but held that Claimant was not so much on a "special mission" for Employer as he was in "special circumstances" in his employment. The Board reasoned that where Claimant was intending to take March 13, 2014, as a sick day, Employer's "on call" policy came into play, and "the fact that the 'on call' policy provides that an 'on call' employee is 'on the clock from the time he leaves home, [this] is a special circumstance which causes Claimant's motor vehicle accident to be in the course and scope of his employment." (Board op. at 11.)

Employer now appeals to this Court.[2] Employer contends that Claimant failed to present "competent evidence sufficient to sustain his burden of proving that he was injured in the course and scope of his employment." (Petition for Review, ¶9.) Specifically, Employer argues that for an injury occurring while the employee was off Employer's premises and traveling to work, Claimant failed to demonstrate that his injury fell into one of the four exceptions to the "coming and going rule," that is, the rule of law generally barring workers' compensation benefits to an employee injured while traveling to or from work. (Petition for Review, ¶10.)

### Discussion

Section 301(c) of the Workers' Compensation Act (Act)[3] provides in pertinent part,

---

[2] Our scope of review is limited to determining whether findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights have been violated. Section 704 of the Administrative Agency Law, 2 Pa.C.S. §704; *Meadow Lakes Apartments v. Workers' Compensation Appeal Board (Spencer)*, 894 A.2d 214, 216 n.3 (Pa. Cmwlth. 2006).

[3] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. §411.

The terms 'injury' and 'personal injury' shall be construed to mean an injury to an employe…arising in the course of his employment and related thereto…The term 'injury arising in the course of employment,' as used in this article…shall include all…injuries sustained while the employe is actually engaged in the furtherance of the business or affairs of the employer, whether upon the employer's premises or elsewhere. . . .

77 P.S. §411.

Whether an employee is acting within the course of his employment at the time of the injury is a question of law, determined on the basis of the WCJ's factual findings, and subject to this Court's plenary review. *Williams v. Workers' Compensation Appeal Board (Matco Electric Co., Inc.)*, 721 A.2d 1140, 1142 (Pa. Cmwlth. 1998), *appeal denied*, 739 A.2d 547 (Pa. 1999).

Generally, for an injury sustained in a commute to or from work, disability is not compensable, with four recognized exceptions: (1) the employment contract includes transportation to and/or from work; (2) the claimant has no fixed place of work; (3) the claimant is on a special assignment or mission for the employer; or, (4) special circumstances are such that the claimant was furthering the business of the employer. *Id.* at 1143.

We focus on the fourth exception, as that is the exception relied upon by the Board. "Special circumstances" have rendered compensable an injury sustained during a commute where: (1) the employee is requested by the employer to come in; (2) the request is for the convenience of the employer or in furtherance of its business; and (3) the trip is not simply for the convenience of the employee. *LoPresti v. Workers' Compensation Appeal Board (Gulf Construction Co.)*, 384 A.2d 1017, 1019 (Pa. Cmwlth. 1978). Further, the request by the employer can be direct or express, on the one hand, or implied, on the other, to qualify as a special request by

8

the employer.  *City of Philadelphia v. Workers' Compensation Appeal Board (Stewart)*, 728 A.2d 431, 433 (Pa. Cmwlth. 1999) (employer's supervisory person made no direct request but did ask whether his suggestions for improving a problem had worked, which claimant took as an implicit request to come from home to the plant; benefits were awarded).

Employer relies upon the reasoning in *Simko v. Workers' Compensation Appeal Board (United States Steel Corp.)*, 101 A.3d 1239 (Pa. Cmwlth. 2014), *appeal denied*, 113 A.3d 282 (Pa. 2015).  However, *Simko* is distinguishable from this case.  In *Simko*, this Court affirmed the Board's reversal of a WCJ's award of benefits to an employee who was injured in an automobile accident on his way to a monthly safety meeting at the employer's workplace.  The claimant there had asserted "special circumstances" in that he had to come in prior to the start of his shift but this Court held, "[c]laimant did not dispute that monthly safety meetings are treated as part of an employee's shift, that employees are paid their hourly wage during the meetings, or that employees must arrive early to attend the meetings.  Although attendance at the meetings furthers [e]mployer's safety goal, it is still part of [c]laimant's regular work duties.  Therefore, the special circumstances exception does not apply."  101 A.3d at 1242-1243.  The focus of a WCJ under the *Simko* analysis is how the employer styles or categorizes the event to which the employee is coming or going, during what would otherwise be considered his or her daily commute.  Unlike the case at bar, the Court in *Simko* was faced with regular, scheduled safety meetings and not emergencies that occur with neither regularity nor predictability.

Here, the WCJ specifically credited Claimant's testimony that he was feeling ill and intended to take a sick day on March 13, 2014.  The WCJ also credited Claimant's testimony that whenever he was called in to work while off site, he

9

received "comp time," to be taken as soon as possible after being called in, and for the same time as the non-exempt, wage employees he supervised, that is, door to door, from home to work and back. In other words, unlike the claimant in *Simko*, when Claimant here was on call, Employer did not treat it as part of Claimant's shift or some extension of his regular shift; rather, Claimant received "comp time." The WCJ found that, but for the emergency with the security cameras, Claimant would not have made the trip to work. The WCJ noted that Ms. Seip wanted Claimant to come into work to resolve the specific problem with the security cameras. The WCJ also found Claimant made these "on call" assignments two to three times monthly. In the present case, however, due to Claimant's illness and the absence of the other employee normally available to address an emergency related to the security cameras, Claimant drove in to rectify the problem when he otherwise would not have gone into work. The fact that Claimant here was sick and would not otherwise have come to work (but for Employer's request to do so) makes the present case readily distinguishable from *Simko*.

The present case is similar to *LoPresti*, a case on which the Board relied and a leading case to define the details of the "special circumstances" exception to the "coming and going rule." In *LoPresti*, the claimant worked as a construction foreman. Due to weather conditions on a scheduled work day, his work was cancelled for the day. The claimant decided to travel to the employer's home office, which was ten miles from where he lived, to pick up his paycheck and discuss a specific job. The claimant received his check and proceeded to discuss the specific job with the employer's president. The claimant and the employer's president also discussed a potential new job involving a house foundation. The employer's president asked the claimant to contact the builder regarding further details of this

10

new job when the claimant got back home and to report back to him. The employer's president explained that it was in that employer's interest for claimant to be there to call the potential customer from his home because the actual reception area at the regular work site was chaotic. Unfortunately, the claimant was involved in an accident on the way home and he succumbed to injuries suffered in that accident the next day.

The WCJ ultimately granted a fatal claim petition brought by the claimant's widow, concluding that the claimant fit within the special circumstances exception to the "coming and going rule" because the employer specifically requested that the employee do something at home for the convenience of the employer. The Board reversed, concluding that the claimant did not fit within this exception. However, this Court reversed the Board and reinstated the decision of the WCJ, which properly applied the exception. We noted that the outcome was consistent with our Superior Court's decision in *Muir v. Wilson Cola Co.*, 168 A.2d 588, 589 (Pa. Super. 1961), which held that the fact that the employer paid the claimant "door to door," i.e., from the moment he left his house, was alone sufficient to support application of the exception to the "coming and going rule."

Similarly, here, Claimant was paid from "door to door" when he was responding to on call assignments or emergencies. Claimant would not have come in on the day in question due to his illness, but for the problem with the security cameras and the direction from his supervisor, Ms. Seip, that the problem needed to be fixed. In other words, Claimant was injured in the course of responding to a direct request from Ms. Seip to come into work (despite his illness and his intention to take a full sick day) and during a time for which he would have been compensated, albeit in the form of comp time.

11

In *William F. Rittner Co. v. Workers' Compensation Appeal Board*, 464 A.2d 675 (Pa. Cmwlth. 1983), this Court affirmed the award of benefits to the widow and minor children of an employee killed on his way home from work. There, an employee had been driving a company van as part of the terms and conditions of his employment, based on that employer's desire "to have the van constantly available to respond to emergencies." These facts comprised "special circumstances" which took that case out of the "coming and going rule." 464 A.2d at 678. Similarly, in the present case, although Claimant was not driving a company vehicle, Employer voiced a specific desire to have employees available ("on call") for emergencies, and it is understandable that in a facility devoted to the care of older citizens, the security cameras would be an important priority.

Further, we reached a similar result in *City of Philadelphia*, in which the claimant drove to one of his employer's sites as part of his requirement to be "on call" every thirteen weeks. The claimant was an electrician normally assigned to a specific plant. On a day when he was on call, the claimant made a trip from home "under the mistaken belief" that a supervisor wanted claimant to go there. 728 A.2d at 431-432. This Court upheld an award of benefits, holding, "[t]he infrequency of Claimant's being 'on call,' coupled with the fact that being 'on call' did not necessarily require that Claimant travel to his workplace, leads this Court to conclude that the act of driving to work…was not part of Claimant's regular duties," but rather was a special assignment or special circumstances so as to qualify as an exception to the "coming and going rule." 728 A.2d at 432-433. We concluded that the claimant "acted in accordance with his responsibilities as the 'on call' electrician and attempted to make his way to the plant in the effort to resolve the situation." 728 A.2d at 433. Similarly here, Claimant has acted in accordance with his "on call"

12

responsibilities in attempting to make his way to work to address an emergency at Employer's request.

Moreover, as in *City of Philadelphia*, being "on call" did not necessarily require that Claimant travel to his workplace, as sometimes he could address the issues by telephone.

Here, Claimant was ill and intended to take a sick day. Indeed, although Claimant normally would have been on call for emergencies, he certainly would not have been expected to come to work when ill and taking a sick day. He was also not required to drive to work if an emergency could be handled by him over the phone. The other employee who usually responded to issues about the security cameras, however, was not available, and when Employer specially requested that Claimant come in, Claimant acquiesced to that request. Claimant was "on the clock" from the moment he picked up the phone at home and fielded Ms. Seip's specific request to fix the security cameras.

For all the above reasons, the Board did not err in concluding that the special circumstances surrounding Claimant's injuries fall within an exception to the "coming and going rule,"

Accordingly, the Board's order is affirmed.

_____
PATRICIA A. McCULLOUGH, Judge

13

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Lutheran Senior Services          :
Management Company,               :
               Petitioner          :
                               :        No. 1074 C.D. 2016
                               :
             v.          :
                               :
Workers' Compensation Appeal      :
Board (Miller),                   :
              Respondent          :

## ***ORDER***

AND NOW, this 15ᵗʰ day of February, 2017, the order of the Workers' Compensation Appeal Board, dated June 8, 2016, is hereby affirmed.


                                 _____
                                   PATRICIA A. McCULLOUGH, Judge